Grad Renewable Energy  Chief Judge Kaczynski, Judge Wallace, Judge Smith, may it please the Court, my name is... You really don't have to bend down like that. Just stand up straight, point it to your mouth, and you're coming through just fine. Thank you. My name is Kevin Ruff, and I represent the appellants in this matter. We submitted a 28-J letter making reference to the recent Telabs decision. I think it's a fairly typical thing in the post-Telabs world to submit such a letter. Our case was decided... When did you submit it? Pardon? When did you submit it? Our 28-J letter. I believe it was sometime in 2007, I believe, maybe July. Oh, this is an old... Okay, this is not something you submitted. No, nothing recently. Okay. But the purpose of that letter was to articulate some of the standards that were discussed and reaffirmed in Telabs that were not applied in the lower court. As you know, the lower court dismissed our case after the first consolidated amended complaint, which was filed approximately six months after the original complaint. The case was dismissed without leave to amend. In the context of the court's decision to dismiss the case, the district court asked numerous questions regarding particularly the confidential witnesses in the case and the confidential witnesses' affiliation with the named defendants, the witnesses' position, and so forth. I recently read an article about how to lose an appeal. And as a result of that, I'd like to focus on what I consider to be the strongest points. Don't worry. You're doing fine. But the strongest points, I believe... You seem to have taken those lessons to heart. Why don't you talk about this case and, you know, in the remaining seven and a half minutes, what is at the heart of this case instead of sort of going for the capillary? Why don't you start with the jugular? Sure, Your Honor. This case is about... We're caught between the 6th and the 11th circuit, if I understand correctly, as to how we deal with prospective statements, right? Well... That's where we're at. And you want to persuade us to go with the 6th, and the other side wants to persuade us to go with the 11th. Is that a summary of where we are? Yes, Your Honor. Okay. So tell us why the 6th has it right and the 11th is out to lunch. Well, Your Honor, the essence of the case, as you know, is that the company in question, Allied Waste, grossly misrepresented its earnings and its free cash flow as a result of a single issue. And that issue is the bread and butter, the heart and soul of any trash company, and that is the fleet, the trucks, Allied Waste. A lot of things are the bread and butter and the heart and soul of a business. Trucks are one thing. Employees, I mean, employees were to walk off the job yesterday, you could have all the trucks in the world, it wouldn't do you any good because nobody could drive them out and nobody would pick up the trash. If they change the environmental laws so as to make it more difficult or expensive to, you know, use dumps, that you have to use dumps further away, that would be the heart and soul. I mean, you know, a lot of these things are the heart and soul. And I thought what Congress said is when you're dealing with future projections, you can be pretty rosy and so long as you give the investors some basis for taking your prediction with caution, you don't have to include everything and you don't have to include the one thing that in fact turns out to go wrong. And that's what the 11th Circuit said. And why isn't that a perfectly plausible and correct interpretation of the statute? Well, we believe that the Sixth Circuit was correct and we believe that the court below was correct when she found that there was no safe harbor here because the specific risk in question was the risk associated with the maintenance, repair, and upkeep of the fleet. The reason why we believe that that's the better position is because at some point a warning or a cautionary statement becomes generic. It's our position that if the 11th Circuit is to be followed. Not really. I mean, they raised a number of things to be cautious about and some of them were quite relevant to the situation. Talk about labor problems. I mean, it is true that if they have labor problems, the fleet would come to a grinding halt. I mean, you can't drive trucks if your drivers are out of stock. Right? That's correct, Your Honor, but that's not an issue in this case. It is true that they gave warnings that were reasonable and rational and that certainly if those kinds of issues had come to pass, would have affected the company's financial condition. But the fact is, and I suppose one argument in favor of our position is, precisely as you just described, the company did list specific risks, such as labor unrest, but it didn't list the specific risk that we believe was the subject of the manipulation, and that was the fleet. I suppose it begs the question, why was the fleet left out? Well, I thought if you look at the legislative history, and I know that some of my colleagues on the panel I know are reluctant to read legislative history, but let's just walk down that path on a hypothetical basis. Just indulge me. I thought Congress said pretty clearly that you don't look at the state of mind of the maker of the statement. What you look at is facts. So the fact that there is some scienter on the state of mind, I mean, Congress wanted to get away from that. I'm going to have to find the quote here, but you know what I'm talking about, right? The legislative history. Well, Your Honor, I have to confess that I'm not totally familiar with the legislative history, but I would say in response. It's usually a wise thing not to read legislative history, but isn't that the whole thrust of these amendments? Congress wanted to provide a safe harbor, and it did not want to have courts looking into what sort of hidden motives management had in making predictions. When it came to predictions, they had a pretty free hand to be loosey-goosey. Well, I wouldn't take it that far. I don't think that the position was that they have a free hand to be loosey-goosey. I certainly think there was an attempt to create a safe harbor. That's obvious. But as the court below found, and I think more consistent with the Sixth Circuit, the cautionary language has to be meaningful in the context of the particular risk that is the subject of the case. And in this case, as I think we all would agree, there was no reference whatsoever to the condition of the fleet. And then in July of 2004, suddenly the condition of the fleet. I found a statement. This is from the conference report number 369, 104th Congress, first session, 31 at 44, as reprinted in 1995 USCAN, 730 at 743. The first part of the safe harbor, and I'm quoting here, the first part of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement. Now, I grant you this is legislative history and to be examined with caution, but it is pretty strong. I mean, if you do look at it, it does give us some insight into what Congress had in mind. It pretty categorically says you don't look at the state of mind of the people making the statement. Well, Your Honor, the court used to under your approach would have to look at the state of mind, right? Pardon, Your Honor? Under your approach, under the Sixth Circuit approach, would have to look at the state of mind. Well, Your Honor, I don't believe that the court below looked at the state of mind. Her decision was based upon her assessment. You lost below. Pardon? You lost below. We did lose below, but as to this particular point, we won. As to this particular point, the court found that there was no safe harbor, and her decision was not predicated on state of mind, but it was predicated on her assessment of the actual language, the actual cautionary language in the context of the alleged misrepresentations. And, Your Honor, I see I only have 25 seconds, so I'd like to reserve for rebuttal. Okay. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, David Hennis on behalf of the appellee's defendant. Since you're at a different height than your opponent, there you go. I don't usually get accused. This is why we provide a flexible mic. I don't usually get accused of not talking loud enough, Your Honor. Your Honor has it exactly right. The Eleventh Circuit in Harris v. Ivax is correct. The first safe harbor, state of mind is irrelevant. I don't remember saying that they were correct. No, you're right, Your Honor. I was simply asking why we shouldn't follow the 11th. Let me now ask you the other question, which I'm equally correct in, I'm sure, because it's a question. Why shouldn't we follow the Sixth Circuit? Why doesn't the Sixth Circuit have it exactly right? Do you still think I'm completely correct? I understand your question, Your Honor. And I think in looking at the statutory and legislative history, the PSLRA says that all you need to provide is a meaningful cautionary language. And the reason that standard is in there is because Congress made the policy judgment that it wanted to encourage companies to continue to make projections, to encourage companies to continue. So let's say you're a drug company, and you know that you've been in contact with lawyers for a potential plaintiff who claims that your drug, the patent for your drug is invalid because its client, the potential plaintiff, is the real inventor and the patent office earned by giving the patent to your client. And assuming that this is one drug provides 60% of the revenues, and you're pretty sure or almost certain that this is going to result in litigation where there is a substantial risk that that patent will be lost. You make your projections. You tell the public to think about labor strikes, to think about competition from other drugs, to think about the fact that some of the ingredients for this drug come from South America, some chemicals come from a country where there might be upheaval and, therefore, there might be an interruption of supply. But you carefully avoid making any reference to the devastating effect of this potential lawsuit, which you know is coming, like the way you're standing on a railroad track and you see the locomotive getting bigger and bigger. In your view, and in the Sixth Circuit view, that is something you could safely leave out. Your Honor, first, I would say that that is not in the statute. So I would suggest that the Sixth Circuit is incorrect. The Sixth Circuit, the statute does not say anything about what one has in one's state of mind. I'm sorry. I misspoke. I said the Sixth Circuit. Under the Eleventh Circuit view, you would be entitled to leave that out. That's correct, Your Honor, because the Eleventh Circuit in Harris says that you don't look to the state of mind of the individuals who are making the statements. That's why there are two safe harbors. The second safe harbor allows you to look at state of mind, and if you can show that they have actual knowledge pledged by specific facts, then you are entitled to proceed with the case. But under the first safe harbor, because Congress said we make the policy judgment that we want to encourage companies to continue to make projections and we understand that projections are a view out into the future and you may be wrong that we're going to create a statute that says all you have to do is provide meaningful, cautionary language. That's what the statute says, and that's what the Eleventh Circuit found in the Sixth Circuit. But they did say you have to provide meaningful, cautionary language. And I take it they didn't mean, you know, a big red letter saying be very cautious, be very afraid, you know, we are management and we have a reason to lie to you and therefore you should suspect everything we say. It means you really have to give some examples of real risks that the company might be facing. And as you read that language and as the Eleventh Circuit read that language, you can do that and knowingly leave out the most likely, the most devastating risk that is just around the corner that will, when the risk materializes almost certainly will, will have a devastating effect on earnings. And you can knowingly leave it out and that's too bad. Your Honor, if we were faithful to the language of the statute, that is the result that would be reached. And the way the courts have interpreted this, such as Harris in the Eleventh, is to say as long as you are in a splash in this circuit, the district court, if you're conveying substantive information, and if you look at Allied Waste's projections here, Your Honor appropriately pointed them out, there were 17 cautions in that particular projection, in that February 10 projection. In the July projection, there were 19 individual-specific, non-boilerplate projections. So I would suggest that we're not anywhere near that world at this point in time. Well, I don't know. I don't agree with that at all. It seems to me that the more other things you have, the more you distract from the one thing that, you know, so coming up with a lot of other stuff is not very helpful to your case at all. I mean, your clients knew darn well that they had a fleet that was being milked in order to service the loan, and they were running the fleet into the ground, and that this would result in huge expenditure right around the corner. Basically, what they were doing, they were eating into their capital to service the debt. And this was not simply a risk. This was a certainty, given sort of the, you know, we all get older, machines don't fix themselves. I mean, this is just the nature of the universe. And when you let maintenance lag, you know that you're going to have a huge expense around the corner to make up for it. Your Honor, I'd like to take issue with two statements you made in that statement. First, you said that my clients knew darn well. Your Honor, we submit that there is not a single allegation in the amended consolidated complaint, 16 months into the case, that says anything about what my clients knew. There is not a single of their nine confidential witnesses that point to a single interaction with any of the four individual defendants. Not one, not a single interaction. The district court found that on three separate occasions, in her opinion. And that is the correct reading of the complaint, and there can be no argument about that. In their brief, they say my clients knew this, the day of reckoning was coming. There is no specific allegation that is pled with specificity, as it must be to make that factual finding. So your position is they were grossly incompetent. No, Your Honor. They were not evil. Absolutely not. They were merely, they just forgot that trucks, that machinery needs to have maintenance, and they just sort of blanked out. Three points on that, Your Honor. Three points. One good one is always best. I'll take it. We have 26,000 employees. They pointed to nine individuals, a dispatcher, an IT person. This is a national organization that operates in 37 states. So look at the opinions of these confidential witnesses. These unnamed people who won't come forward with who they are to say these defendants knew that, and it's reasonable to assume the reasonable inferences that these defendants knew that. That is not a reasonable inference, Your Honor. That is certainly not a strong inference. Okay? And the second point I'd like to make is the maintenance costs were not the reason that Allied Waste missed its projections. They say that a lot in their papers. They think that's their dressed-up claim. The reason the projections were missed is because the company did not get price increases it thought it was going to get, and it disclosed a warning about that, and it had more costs associated with its best practices program. It only had increased maintenance costs in the out years. This is interesting, but we're not the jury here. I mean, this is a very good defense, and I'm sure when you go to the jury with it, you win. But we're here at the pleading stage. We have to accept their pleadings as given, and the question is, is it sufficient? So the fact that you have a different story is sort of novel. I mean, we don't often get cases where defendants and plaintiffs have different stories, but this is sort of a novelty here, as you can imagine. I would respectfully submit, Your Honor, that that is not my story and it's not my argument to the jury. That is in the complaint that is incorporated by reference into the complaint as this Court is allowed to see, as the district court was allowed to see. What is incorporated? The press release announcing why the company was lowering its future projections. And remember, that's all that's going on here. The company – But a company press release could be a lie. It usually is. And it's the – So we don't have to take it as a gospel truth. And, you know, how did they put it? You're right, Your Honor. You don't have to take it as a gospel truth when they plead specific facts giving rise to a strong inference of Sienter. That's when you don't have to take it as true. Until otherwise, and there are no specific facts here, this Court should not consider anything that Allied Waste said to be false. Don't they allege that you had to replace the fleet at a cost of $150 million? I'm sorry, Your Honor. Could you repeat that? Don't they allege that you had to replace the fleet at a cost of $150 million? That came later. That was after the class period, and that came in later years. That was not during the class period. And, again, as I said earlier, there are no specific facts whatsoever, not a single specific fact that has any contact between the confidential witnesses and the individual defendants here, not one. And, Your Honor, if I could just close by saying they had plenty of time to come up with that. They had 16 months at the hearing. The district court, this is at ER 111, said, Your complaint is not pleaded with specificity as it's required to be. What else do you have? They said, We'll go out and re-interview our witnesses. They came back a month later with a letter and said, We've re-interviewed them and we have more facts. The district court looked at that and said, No, these are not new. You said this at the hearing. You said this in your papers. And under this Court's decisions in Vantive and Lipton, when someone has the chance to come forward with facts and doesn't, we respectfully submit that there are no new facts, that leave to amend was appropriately denied, and that that should be affirmed in all respects. Let me ask you a question. I know your time is gone, but we'll use my time. Yes, Judge Walz. And Judge Walz has unlimited time. Thank you, Your Honor. I'm interested in the stock situation where holdings went up 31 percent of the accused individuals, and I understand from the response that these were just bonuses that happened to vest at the period. Now, that's an issue one way or the other, but your argument is that they didn't need, if these people were really at the center, they wouldn't be keeping their stock, they'd be selling their stock. But at this juncture, we're just on the pleadings. Were there pleadings made that the defendants had holdings that increased 31 percent during this period? Yes, Your Honor. Consistent with this Court's precedent in Silicon Graphics, the Court and this Court is entitled to look at the publicly filed documents with the SEC in order to get the true picture of what the trading activity is. So that's incorporated by reference into the complaint. And the undisputed facts are that even though it was vesting of restricted stock, that was vested, that could have been sold at any point in time. And in Silicon Graphics, this Court quite clearly stated that you look at all of the defendants' vested holdings in assessing what their trading history is. And tying that back to Telabs, as my esteemed counsel. So this is an exception to the usual rule that you look only to the four corners of the complaint. That's correct, Your Honor, because they alleged it, and we can look at the SEC filings that support it so that they can't just make mistakes, as they did in their complaint, and say this is what the true facts are. Then I take it your response is that there's not sufficient proof of scienter for it to go forward. And that the confidential witnesses did not provide the necessary evidence. And then, as I understand, at the very end, when the district court was pressing your opposition, they could not indicate what else they would do other than reinterview, and then that ended the case. How does that scienter issue interface with the safe harbors argument? What it does in two ways, Your Honor. There are actually four independent bases for dismissal. There's scienter, there's falsity, there is the safe harbor. The safe harbor provides an independent, completely unrelated to the scienter point basis for dismissal, since that has no knowledge baked into it. There is also a safe harbor, the second safe harbor, requires actual knowledge to be pled. That's the standard here. So under the typical scienter standards under Rule 10b-5, and in the PSLRA, both require actual knowledge. So these are, as you see them, alternative defenses. Yes, Your Honor. And the district court found against you on the safe harbor. You indicate you think the district court was in error, although you did not appeal that. But regardless of the safe harbor, I take it it's your position that that can be cast aside if the court finds that there's no sufficient evidence of a strong showing of scienter. Is that correct? That's completely correct, Judge Wallace. There is no scienter. There is no falsity. Those are two independent. I understand. You've answered my question. I appreciate that. And I would just say we didn't believe that we needed to appeal that issue, Your Honor. That's an independent basis in the record for affirmance. So and the district court simply said I'm not going to decide the issue in your favor at this point in time. She declined to dismiss on that ground. Okay. Thank you. In closing, Your Honors. You've closed. Thank you, Your Honors. I appreciate it. That was my time. You don't get to close. I do. Thank you, Judge. Your Honors, I only have about 30 seconds. The thing I'd like to focus on is eminence capital and the extremely liberal standard for amendment. Counsel made a number of points, particularly regarding the stock sales. There were. You've had plenty of chances to amend. Well, Your Honor, the characterization is slightly misleading in that at the time that we were we didn't we didn't know what the court's decision was until she made it. We didn't know what the basis for his decision was until she made it. She made her decision. She asked numerous questions of our confidential witnesses who are, by the way, including a person who is himself responsible for actually making the forecast in question and not just dispatchers, as counsel suggested. We would just like the opportunity to go answer her questions. And, you know, as stated, I would also like to mention a fact, for example, that we would mention, which is Hathaway, the chief financial officer in 2005 just after the class period ended, actually in a conference call stated that there was a maintenance costs were going up because of a backlog, if you will. There was a lot of maintenance that wasn't being done on the trucks. That's just after the class period ended, and it's totally consistent with her position that they were simply ignoring the fleet. Going to your going to your Mr. Bain, confidential witness is number one. Yes. Confidential witness one. Do I understand correctly that that witness was let go before the window, the class action window? I think you're right, Your Honor. So this confidential witness wasn't even in the company during the time period that we're focusing upon to find whether there was cyanide. Well, he was at the company, Your Honor, when the actual forecasts were being made for the 2004 and participated in those forecasts. And to the extent that he left the company just before they were actually published, it was a very brief time frame. Well, yes. But he was not around to overhear or be a participant in any conversations with the target defendants during that window. What you're arguing is he knows something that happened before, which will inform us what happened during the window. Well, Your Honor, it is our position that you know what happened after the window, and you think that will also inform us of what happened in the window. Now, my question, as I understand the logic of it, and if it was before a jury, I could understand it, but in the preciseness of pleadings, can you really do that? Don't you have to have witnesses that will focus on what was actually said or done by the target defendants rather than speculation based upon what happened before or after? That's my question. Well, Your Honor, I think this is somewhat of a continuum, and I would just like to address factually that this witness, CW1, who, by the way, they've identified and actually contacted at some point, is a person who worked soup to nuts on the issue that we're talking about. So it's not a situation where he stopped working on it and then could only speculate on what happened. He actually worked on it through the time frame when the new forecast, the one that included the baked numbers and the failure to account for the fleet maintenance, when those were baked into the forecast. So to the extent he wasn't participating in the actual, wasn't working with the company when they were actually disseminated, we don't believe it's a meaningful time distinction. Okay. One further question. You indicated that you may have been cut off a little early. If I understand the record correctly, at the final hearing, the district judge said, asked the question, what else can you plead? What can you amend? And at that time, as I understand the response that I read from the record, the answer was that it was not known and the confidential witnesses would have to be reexamined. And she said, no, you're a competent lawyer. You've had a lot of experience. You have to be ready, and I won't give you additional time. What's wrong with that? Why is that an abuse of discretion by the judge after those facts to say that was going to end it? Well, Your Honor, I think it depends on the circumstances. And had the judge been absolutely clear during that hearing as to what she considered the deficiencies to be, then maybe that would be a reasonable position. But I would end by quoting Eminence Capital, where the court said, in every case, quote, how much detail is enough under PSLRA? When is the inference of deliberate recklessness sufficiently strong? I mean, every case is different. And I guess I would end by saying also as an advocate, I think it's very difficult as an advocate when you're simultaneously arguing to the court, hey, we have met the standard, let us go forward with discovery, to then at the same time say, well, here's a bunch of other information. It sort of undercuts your argument that you've already presented sufficient evidence. I suppose what she's saying is that you'd have adequate opportunity to interview these witnesses, whatever was said in the testimony. And she's probably asking, is there anything else that you know of? If that was her intention, rather than asking you to begin from scratch one to go look, would that then be an abuse of discretion? Your Honor, I think it's every case is different. Under these circumstances, given the high standard we have to meet, we would ask for the opportunity to be able to do everything we can in a follow-up complaint. All right. Thank you very much, counsel. Thank you. Okay. Just argue a sense of evidence.
judges: Kozinski, Wallace, Smith